**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

**25 CP, LLC**

    **v.**                                              Case No. 09-cv-80-PB
                                                                 Opinion No. 2009 DNH 185
**Firstenberg Machinery Co.
and Grifols USA, LLC**


**MEMORANDUM AND ORDER**

    25 CP, LLC has sued Firstenberg Machinery Company, Inc. and
Grifols USA, LLC for breach of contract.  Firstenberg and Grifols
each now move to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(2), claiming that this court does not have
personal jurisdiction over them.  For the reasons set forth
below, I deny Firstenberg's motion and deny Grifols' motion
without prejudice to its right to reinstate the motion, if
appropriate, after jurisdictional discovery has been completed.


**I.  BACKGROUND**

**A.  The Parties and Other Relevant Entities**

    25 CP is a New Hampshire limited liability company whose
primary business purpose is the "[o]wnership and management of
real estate and related activities."  (Certification of

Formation, Doc. No. 13-4, at 4.)  Firstenberg is a California
corporation that sells used and new biomedical parts and
machinery.  (Firstenberg Aff., Doc. No. 13-3, ¶¶ 2-3.)  Grifols,
a biomedical research and development institute, is a Florida
limited liability company with a principal place of business in
Los Angeles, California.  (Bill in Equity for Specific
Performance and Damages (hereinafter "Complaint"), Doc. No. 1-2,
¶ 8; Stopher Aff., Doc. No. 14-3, ¶ 3.)

     25 CP alleges that it contracted (through its representative
Matthew Halvorsen) with Firstenberg (through Firstenberg's
employee Victor Gonzales) to purchase a Hull Lyophilizer ("the
Hull"), a large freeze-drying unit.[1]  (See Mem. of Law in Supp.

---

[1] Neither party makes any specific allegations concerning
the location from which Halvorsen conducted business.  It
appears, however, to be undisputed that the communications
Gonzales transmitted to Halvorsen were transmitted to Halvorsen
in New Hampshire.  (See, e.g., Mem. of Law in Supp. of Pl.'s
Objection to Firstenberg's Mot. to Dismiss, Doc. No. 16-2, at 7
("Firstenberg emailed an offer to sell the Hull to Mr. Halvorsen
in New Hampshire.) (emphasis added).)  Three additional documents
suggest that Halvorsen was operating out of New Hampshire:  (1)
an invoice Gonzales emailed to Halvorsen, which included the
line, "Attention:  Matthew Halvorsen" and noted that the Hull was
being sold to Lyophilization Services of New England, a company
with a New Hampshire address and phone number; (2) a letter
Halvorsen mailed Gonzales, whose letterhead included a New
Hampshire address; and (3) a letter Halvorsen mailed to the
president of Firstenberg, with the same letterhead address.
(See Gonzales Aff. Doc. No. 13-5, at 6, 8; Firstenberg Aff. Ex.
B, Doc. No. 13-3, at 7-8.)  Thus, I assume that Halvorsen made or

of Pl.'s Objection to Firstenberg's Mot. to Dismiss, Doc. No. 16-2, at 2-3; 25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. A, Doc. No. 16-3, at 2[2]; Pl.'s Obj. to Firstenberg's Mot. to Dismiss, Doc. No. 16-1, at 1.)  25 CP alleges that Grifols was the "undisclosed principal owner" of the Hull and that Firstenberg acted as Grifols' agent in attempting to sell the Hull.  (See Compl., Doc. No. 1-2, ¶ 21; Pl.'s Objection to Firstenberg's Mot. to Dismiss, Doc. No. 16-1, at 1.)  During Halvorson's negotiations with Gonzales, Gonzales believed that Halvorsen was representing a fourth company, Lyophilization Services of New England ("LSNE"), a New Hampshire corporation that is not a party to this suit.  (See Gonzales Aff., Doc. No.

---

received all the relevant communications in New Hampshire.  If Firstenberg and Grifols have some basis to challenge this assumption, they can move to reconsider this order denying their motions to dismiss.

[2] 25 CP has provided the emails and letter I cite in this order but has not provided an affidavit that demonstrates their authenticity.  (See Grifols' Reply to 25 CP's Objection to Mot. to Dismiss for Lack of Personal Jurisdiction, Doc. No. 21, at 2-3.)  Firstenberg has provided some, but not all, of the same documents in authenticated form.  (See attachments to Firstenberg's Mot. to Dismiss, Doc. No. 13.)  I will assume that 25 CP's emails and letter are authentic provided that 25 CP can produce an affidavit confirming their authenticity within ten days.  If a satisfactory affidavit is not timely filed, Firstenberg and Grifols may file motions to reconsider the denial of their motions to dismiss.

13-5, ¶¶ 2-5.)[3]

**B.    The Alleged Contract and Breach**

On December 3, 2008, Halvorsen received an unsolicited email
from Gonzales that listed equipment Firstenberg was selling.
(Compl., Doc. No. 1-2, ¶ 10; see also 25 CP's Objection to
Firstenberg's Mot. to Dismiss Ex. A, Doc. No. 16-3, at 3-6.)
Halvorsen wrote back to Gonzales and expressed interest in two
pieces of equipment.  (Compl., Doc. No. 1-2, ¶ 11; see also
25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. A, Doc.
No. 16-3, at 3.)  Gonzales responded by providing information on
both pieces.  (Compl., Doc. No. 1-2, ¶ 12; see also 25 CP's
Objection to Firstenberg's Mot. to Dismiss Ex. A, Doc. No. 16-3,
at 2.)  On December 4, Halvorsen again expressed interest in one
of the two pieces of equipment, the Hull.  (Compl., Doc. No. 1-2,
¶ 13.)  In response, Gonzales emailed Halvorsen pictures of and
information about the Hull.  (Id.; see also 25 CP's Objection to

---

[3] Although 25 CP does not explicitly deny that Halvorsen was
initially acting as a representative of LSNE, 25 CP appears to
contend that 25 CP, and not LSNE, eventually contracted with
Firstenberg to buy the Hull.  (See Firstenberg Aff. Ex. B, Doc.
No. 13-3, at 7-8 (a letter Halvorsen sent to the President of
Firstenberg after the alleged breach, noting that "[LSNE is] not
a party to the contract [for the Hull] between 25 CP, LLC and
Firstenberg Machinery, Co.").)

Firstenberg's Mot. to Dismiss Ex. B, Doc. No. 16-4.)

On December 5, Gonzales and Halvorsen negotiated a price
over the telephone and Gonzales emailed an invoice to Halvorsen
to confirm the price.  (See Compl., Doc. No. 1-2, ¶¶ 15-16;
25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. C, Doc.
No. 16-5, at 2-3.)  The invoice noted that the purchaser was
"Lyophilization Services of New England," or LSNE.  (See 25 CP's
Objection to Firstenberg's Mot. to Dismiss Ex. C, Doc. No. 16-5,
at 3.)  On December 8, following additional telephone
conversations, Gonzales emailed Halvorsen an updated invoice.
(Compl., Doc. No. 1-2, ¶ 17.)  The updated invoice differed from
the initial one in that it required "25% [p]ayment with order,"
with the remainder due before shipping, instead of simply
requiring the entire payment before shipping.  (Compl., Doc. No.
1-2, ¶ 18; see also 25 CP's Objection to Firstenberg's Mot. to
Dismiss Ex. C, Doc. No. 16-5, at 5.)  Both invoices noted that
the buyer was responsible for rigging and shipping the unit.
(See Compl., Doc. No. 1-2, ¶ 18; 25 CP's Objection to
Firstenberg's Mot. to Dismiss Ex. C, Doc. No, 16-5, at 3, 5.)

On December 10, Halvorsen sent Gonzales a check for $47,500
(twenty-five percent of the total purchase price), and noted in

an accompanying letter that this check would "confirm the purchase" of the Hull.  (Compl., Doc. No. 1-2, ¶ 19; 25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. D, Doc. No. 16-6.) The check was drawn on 25 CP's account at Centrix Bank & Trust, located in Bedford, New Hampshire, and listed a New Hampshire address for 25 CP.  (See Gonzales Aff. Ex. B., Doc. No. 13-5, at 9.)  Halvorsen requested that the unit be available for shipping within twenty days of December 11.  (See Compl., Doc. No. 1-2, ¶ 19; 25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. D, Doc. No. 16-6.)  According to Halvorsen's bank, Firstenberg cashed the check on or before December 12.  (See Compl., Doc. No. 1-2, ¶ 20.)

On December 16, Gonzales emailed Karl Miller, whose company was going to rig the Hull at Halvorsen's expense, and asked him to contact Halvorsen, who was copied, directly regarding shipping.  (See Compl., Doc. No. 1-2, ¶ 21; 25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. E, Doc. No. 16-7, at 2.)  In that same email, Gonzales mentioned that he "still [had] not received a confirmation as to when Grifols [would] have the utilities disconnected from the machine."  (25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. E, Doc. No. 16-7, at 2; see

<u>also</u> Compl., Doc. No. 1-2, ¶ 21.)  Gonzales also mentioned that
he thought the unit would likely be shipped after January 1,
2009.  (See 25 CP's Objection to Firstenberg's Mot. to Dismiss
Ex. E, Doc. No. 16-7, at 2-3.)  Halvorsen then emailed Gonzales
"expressing a desire to file a UCC notice on the Hull 140."
(Compl., Doc. No. 1-2, ¶ 23; <u>see also</u> 25 CP's Objection to
Firstenberg's Mot. to Dismiss Ex. E, Doc. No. 16-7, at 2.)
Gonzales replied by saying, among other things, that Firstenberg
had received Halvorsen's deposit and "[would] send out an
agreement by the end of [the] week covering the purchase of the
machine[,] including a refund of the deposit if the purchase
[could not] be concluded."  (25 CP's Objection to Firstenberg's
Mot. to Dismiss Ex. E, Doc. No. 16-7, at 2; <u>see also</u> Compl., Doc.
No. 1-2, ¶ 23(a)-(b).)

Finally, on December 17, Gonzales called Halvorsen to
explain that the seller was removing the Hull from the market and
that Halvorsen's deposit would be returned.  (Compl., Doc. No. 1-
2, ¶ 24.)  25 CP alleges that "[a]t the time of receipt of the
updated invoice [on December 8], both 25 CP, LLC and Firstenberg
had entered into a valid contract for the sale of the Hull" and
that "[r]eceipt and deposit of the $47,500 deposit check by
Firstenberg made the contract binding and required performance by

both parties[:]  tender of the Hull . . . by Firstenberg and
final payment by 25 CP, LLC."  (<u>Id.</u> ¶ 25.)  Thus, 25 CP alleges,
Firstenberg breached the contract when it failed to tender the
Hull.

## II.  <u>STANDARD OF REVIEW</u>

When a defendant contests personal jurisdiction under Rule
12(b)(2), the plaintiff bears the burden of demonstrating a basis
for asserting jurisdiction.  <u>Hannon v. Beard</u>, 524 F.3d 275, 279
(1st Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 726 (2008).  Because I
have not held an evidentiary hearing, 25 CP need only make a
prima facie showing that the court has personal jurisdiction over
Firstenberg and Grifols.  <u>See</u> <u>Sawtelle v. Farrell</u>, 70 F.3d 1381,
1386 n.1 (1st Cir. 1995) (citing <u>United Elec. Radio & Mach.</u>
<u>Workers of America v. 163 Pleasant Street Corp.</u>, 987 F.2d 39, 43
(1st Cir. 1993)).

To make a prima facie showing of jurisdiction, a plaintiff
may not rest upon the pleadings.  Rather, the plaintiff must
"adduce evidence of specific facts" that support its
jurisdictional claim.  <u>See</u> <u>Foster-Miller, Inc. v. Babcock &</u>
<u>Wilcox Canada</u>, 46 F.3d 138, 145 (1st Cir. 1995).  I do not act as
a factfinder when considering whether a plaintiff has made a

-8-

prima facie showing of personal jurisdiction.  Rather, I
determine "whether the facts duly proffered, [when] fully
credited, support the exercise of personal jurisdiction."
Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 84 (1st Cir.
1997).  I may also "add to the mix facts put forward by the
defendants, to the extent that they are uncontradicted." Mass.
Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34
(1st Cir. 1998).  While the prima facie standard is liberal, and
I construe the facts offered by the plaintiff in the light most
favorable to its claim, I need not "'credit conclusory
allegations or draw farfetched inferences.'" Id. (quoting
Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir.
1994)).


### III.  <u>ANALYSIS</u>

Federal Rule of Civil Procedure 4(k)(1)(A) provides that
"[s]erving a summons or filing a waiver of service establishes
personal jurisdiction over a defendant . . . who is subject to
the jurisdiction of a court of general jurisdiction in the state
where the district court is located." Fed. R. Civ. P.
4(k)(1)(A).  Thus, when assessing personal jurisdiction over a
non-resident defendant in a diversity of citizenship case such as

this one, the federal court "'is the functional equivalent of a state court sitting in the forum state.'" Sawtelle, 70 F.3d at 1387 (quoting Ticketmaster, 26 F.3d at 204).  Because New Hampshire's relevant long-arm statute, N.H. Rev. Stat. Ann. § 293-A:15.10, authorizes jurisdiction to the full extent permitted by the Federal Constitution, the sole inquiry in this case is "whether the exercise of personal jurisdiction comports with federal constitutional standards." Sawtelle, 70 F.3d at 1388.

The Fourteenth Amendment's Due Process Clause precludes a court from asserting jurisdiction over a defendant unless "the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).  The "constitutional touchstone" for personal jurisdiction is "whether the defendant purposefully established 'minimum contacts' in the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  The inquiry into "minimum contacts" is necessarily fact-specific, "involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case." Pritzker v. Yari, 42

-10-

F.3d 53, 60 (1st Cir. 1994).  A defendant cannot be subjected to the forum state's jurisdiction based solely on "random, fortuitous, or attenuated" contacts.  Burger King, 471 U.S. at 475 (internal quotations omitted).  Rather, "'it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

A court may exercise authority over a defendant by means of either general or specific jurisdiction.  Northern Laminate Sales, Inc. v. Davis, 403 F.3d 14, 24 (1st Cir. 2005).  General jurisdiction exists over a defendant who has maintained "continuous and systematic" activity in a forum sufficient to establish jurisdiction in that state over all matters including matters unrelated to the defendant's contacts to the forum state. Id. (citing Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999)).  In contrast, specific jurisdiction is narrower in scope and exists only when the cause of action arises from or relates to the defendant's contacts with the forum state.  Id.  25 CP argues only that this court should

exercise specific jurisdiction over Firstenberg and Grifols.[4]   In
the First Circuit, "the constitutional analysis [regarding
specific jurisdiction] is divided into three categories:
relatedness, purposeful availment, and reasonableness." Phillips
v. Prairie Eye Ctr., 530 F.3d 22, 27 (1st Cir. 2008), cert.
denied, 129 S. Ct. 999 (2008); Daynard v. Ness, Motley, Loadholt,
Richardson & Poole, P.A., 290 F.3d 42, 60 (1st Cir. 2002).   In
order to satisfy its burden and establish personal jurisdiction,
"[t]he plaintiff must demonstrate that each of these three
requirements is satisfied." Prairie Eye Ctr., 530 F.3d at 27.

    In a contract action such as 25 CP's, the mere existence of
a contractual relationship between an out-of-state defendant and
a forum-state plaintiff is insufficient, in itself, to establish
jurisdiction in the plaintiff's home forum.   See Burger King, 471
U.S. at 478; Phillips Exeter, 196 F.3d at 290; Ganis Corp. of
Cal. v. Jackson, 822 F.2d 194, 197 (1st Cir. 1987); Bond Leather

---

[4] Firstenberg argues in its reply memorandum that 25 CP is
essentially asking this court to exercise general jurisdiction
over Firstenberg when it argues that Firstenberg's contacts with
LSNE create jurisdiction over Firstenberg in 25 CP's suit. (See
Firstenberg's Reply to 25 CP's Objection to Mot. to Dismiss, Doc.
No. 20, at 2.)  Firstenberg mischaracterizes the situation.  25
CP is requesting that this court exercise specific personal
jurisdiction on the basis of Firstenberg's contacts with
Halvorsen, who was associated with both 25 CP and LSNE.

Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 933-34 (1st Cir. 1985).  Under the "contract-plus" analysis adopted by the Supreme Court in Burger King, the contract between the parties is merely an intermediate step in an ongoing process.  See United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant Street Corp., 960 F.2d 1080, 1090 (1st Cir. 1992) [hereinafter Pleasant St. I] (citing Burger King, 471 U.S. at 479), appeal after remand, 987 F.2d 39 (1st Cir. 1993); Ganis, 822 F.2d at 197 (same).  Accordingly, to determine whether Firstenberg and Grifols purposefully established minimum contacts with New Hampshire, I must evaluate the parties' "'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" Phillips Exeter, 196 F.3d at 290 (quoting Burger King, 471 U.S. at 479). Moreover, I must make my assessment of Firstenberg and Grifols' New Hampshire contacts in light of "all of the communications and transactions between the parties, before, during and after the consummation of the contract." Ganis, 822 F.2d at 197.[5]  With

---

[5]  Some cases apply the "contract-plus" analysis when evaluating contacts under the relatedness prong.  See, e.g., GT Solar Inc. v. Goi, 2009 DNH 156, 27.  Others apply it when discussing the purposeful availment prong.  See, e.g., Raymarine, Inc. v. Argonaut Computer, Inc., 2002 DNH 147, 14 (D.N.H. 2002). I refer to the pre-contract communications between 25 CP and

these principles in mind, I apply the tripartite test for specific jurisdiction to Firstenberg after briefly introducing Firstenberg's arguments against the exercise of specific jurisdiction.  I then discuss whether this court may impute Firstenberg's contacts to Grifols for the purpose of exercising personal jurisdiction over Grifols.

## A.    **Personal Jurisdiction over Firstenberg**

Firstenberg essentially argues that any contacts it may have had with New Hampshire were not "related" to 25 CP's claims in this case because those claims arise from a contract Firstenberg made with LSNE, not 25 CP.  Firstenberg, however, does not cite any authority or reasoned argument in support of the proposition that a seller is not subject to jurisdiction in a breach of contract action brought by a buyer where the seller negotiates with a representative in the forum state (Halvorsen), and believes he is contracting with one company (LSNE) in the forum state but gets paid by another company (25 CP) in the forum state.  Thus, the fact that Gonzales thought that his contacts culminated in a contract with LSNE rather than 25 CP does not prohibit this court from exercising personal jurisdiction.

Firstenberg in both sections, as they are relevant to both relatedness and purposeful availment.

Instead, if Gonazales' contacts with Halvorsen meet the three-pronged First Circuit test, I may assert personal jurisdiction over Firstenberg.[6]

### 1.   Relatedness

"The evidence produced to support specific jurisdiction must show that the cause of action either arises directly out of, or is related to, the defendant's forum-based contacts."  Harlow v. Children's Hosp., 432 F.3d 50, 60-61 (1st Cir. 2005).  In a contract case, the court must consider whether the defendant's forum-based activities were instrumental in the formation or breach of the contract.  Phillips Exeter, 196 F.3d at 289; see also Mass. Sch. of Law, 142 F.3d at 35 (formation); Pleasant St. I, 960 F.2d at 1089 (same).

---

[6] Firstenberg also argues that LSNE is a required party to this suit under Federal Rule of Civil Procedure 19(a) because "LSNE [was] the only entity with whom FMC was attempting to negotiate the purchase of the Hull."  (See Firstenberg's Mem. of Law in Supp. of Its Mot. to Dismiss, Doc. No. 13-2, at 8.)  This argument is irrelevant to the question of whether personal jurisdiction exists.  Firstenberg may move to add LSNE as a party, or to dismiss 25 CP's claims, if it believes that these claims have merit.

In addition, Firstenberg briefly argues that 25 CP's claim is barred by the Statute of Frauds because Firstenberg never signed a writing "that constitutes a contract to sell the Hull Freeze Dryer to 25 CP."  (See id. at 1, 8.)  Firstenberg may assert this argument in a motion to dismiss for failure to state a claim, but the argument is irrelevant here.

A determination of relatedness begins with an identification of all of the defendant's alleged contacts with the forum state. United States v. Swiss Am. Bank, 274 F.3d 610, 621 (1st Cir. 2001) (reasoning that there can be "no requisite nexus between the contacts and the cause of action if no contacts exist"). Here, Firstenberg is a California corporation with a principal place of business in Richmond, California. (See Firstenberg's Mem. of Law in Supp. of Its Mot. to Dismiss, Doc. No. 13-2, at 2.) Firstenberg does not maintain a branch office, telephone listing, or mailing address in New Hampshire, nor does it have any real or personal property there. (Id.) None of Firstenberg's directors, officers, or employees reside, hold meetings, or attend conferences in New Hampshire. (Id.) Firstenberg does not advertise in publications that target New Hampshire consumers. (Id.) Firstenberg does not employ any New Hampshire residents to market, distribute, or service its products. (Id.)

Firstenberg did, however, direct multiple communications, by telephone and email, into New Hampshire through its employee, Gonzales. Telephone calls and letters clearly constitute contacts for jurisdictional purposes. See Sawtelle, 70 F.3d at 1389-90; Mass. Sch. of Law, 142 F.3d at 36; Swiss Am. Bank, 274

-16-

F.3d at 622.  Courts have considered email messages "contacts" as well.  See, e.g., GT Solar Inc., v. Goi, 2009 DNH 156, 27 (D.N.H. 2009); Trade Wings, LLC v. Technetic, Inc., 2002 DNH 182, 8-9 (D.N.H. 2002).[7]

These telephone and email contacts were instrumental to the formation of the alleged contract at issue here.  On December 3, Gonzales emailed Halvorsen with information about equipment for sale.  (See 25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. A, Doc. No. 16-3, at 3.)  Halvorsen emailed to express interest in two units and Gonzales replied with more information on these units.  (See id. at 2-3.)  The Hull was priced at $330,000.  (See id. at 2.)  The next day, after Halvorsen expressed continued interest in the Hull, Gonzales emailed

---

[7] The First Circuit has noted that "there is a natural blurring of the relatedness and purposeful availment inquiries in cases . . . in which the alleged contacts are less tangible than physical presence," and that "in such circumstances, an inquiring court must determine the extent to which the defendant directed an out-of-state activity at the forum state in order to ascertain whether the activity can be termed a contact at all." Phillips Exeter, 196 F.3d at 289.  Here, Gonzales called Halvorsen in New Hampshire before sending the first of the emails relevant in this case.  (See 25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. A, Doc. No. 16-3, at 3.)  I assume that Gonzales called a number with a "603" New Hampshire area code because Firstenberg has not contended otherwise.  Thus, I assume that Gonzales knew that Halvorsen was located in New Hampshire when he sent the first email, and that sending the email therefore constitutes a contact.

Halvorsen photographs of the machine and information about its previous use.  (See Compl., Doc. No. 1-2, § 13; see also 25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. B, Doc. No. 16-4.) On December 5, after several telephone conversations, Gonzales emailed Halvorsen an invoice for the Hull, priced at $190,000. (Compl., Doc. No. 1-2, § 15; see also 25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. C, Doc. No. 16-5, at 2-3.)   On December 8, following additional telephone conversations, Gonzales emailed Halvorsen an updated invoice.  (Compl., Doc. No. 1-2, ¶ 17.)  The updated invoice differed from the initial one in that it required "25% [p]ayment with order" instead of simply requiring the entire payment before shipping.  (Compl., Doc. No. 1-2, ¶ 18; see also 25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. C, Doc. No. 16-5, at 5.)  On December 10, Halvorsen sent Gonzales a check for $47,500 from 25 CP that was drawn on a New Hampshire bank and listed a New Hampshire address for 25 CP.

     Clearly, if a contract resulted here, Gonzales' telephone calls with and emails to Halvorsen were instrumental in its formation.  Halvorsen became aware that the Hull was available because Gonzales emailed him.  Halvorsen learned the initial price of the Hull in the same way.  All negotiations between Halvorsen and Gonzales appear to have taken place over the phone,

and all prices and terms were confirmed via email.

Firstenberg correctly points out that it offered the Hull for sale "as is, where is," and if it breached a contract, that breach would have taken place in California, where it allegedly accepted payment and then failed to perform.  (See Firstenberg's Reply to 25 CP's Objection to Mot. to Dismiss, Doc. No. 20, at 3-4); Phillips Exeter, 196 F.3d at 291 ("[A] contract arguably is breached where a promisor fails to perform.")  That Firstenberg's activities in California were instrumental to the alleged breach, however, does not prevent this court from exercising personal jurisdiction over him.  See Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg., 295 F.3d 59, 65 (1st Cir. 2002) ("That events elsewhere also bear upon the claim . . . does not negate the existence of minimum . . . contacts related to the claim."); Phillips Exeter, 196 F.3d at 291 (location of breach not dispositive).  Thus, because Firstenberg's contacts with New Hampshire were instrumental to the formation of the alleged contract, those contacts are sufficiently "related" to satisfy the first prong of the three-part test.[8]

---

[8] Firstenberg's final attack on 25 CP's "relatedness" argument is misleading and irrelevant.  25 CP cites the Restatement (Third) of Agency § 6.02 (2006) in its discussion of "relatedness" for the proposition that when an agent makes a

**2.   Purposeful Availment**

Under the second element of the tripartite test, I must
determine whether Firstenberg's forum-related contacts constitute
a purposeful availment of the privilege of conducting activities
in New Hampshire, thereby invoking the benefits and protections
afforded by New Hampshire's laws.  See Burger King, 471 U.S. at
475-76; Phillips Exeter, 196 F.3d at 288; Nowak v. Tak How
Investments, Ltd., 94 F.3d 708, 712-13 (1st Cir. 1996).  The
purposeful availment requirement focuses on "whether a defendant
has 'engaged in any purposeful activity related to the forum that

---

contract on behalf of an unidentified principal, the principal,
agent, and third party are all generally parties to the contract.
(See Mem. of Law in Supp. of Pl.'s Objection to Firstenberg's
Mot. to Dismiss, Doc. No. 16-2, at 8-9 (asserting that
Firstenberg's contacts with Halvorsen led to a contract between
25 CP (the third party), Grifols (the unidentified principal),
and Firstenberg (the agent)).)  Firstenberg argues that 25 CP is
trying to assert that it was an unidentified principal and LSNE
was its agent, and then argues that 25 CP was not "unidentified"
because Firstenberg had no notice that 25 CP existed when
Firstenberg was negotiating with Halvorsen.  (See Firstenberg's
Reply to 25 CP's Objection to Mot. to Dismiss, Doc. No. 20, at
4.)  25 CP, however, was not describing itself as the
"unidentified principal" in the passage of its objection that
Firstenberg cites; rather, it was describing Grifols as the
unidentified principal.  If there is a principal-agent
relationship between 25 CP and LSNE, it appears that it would be
one of agent and undisclosed principal because, as Firstenberg
points out, Firstenberg had no notice of 25 CP's existence.  See
Restatement (Third) of Agency § 1.04 (2006).  In any case, the
fact that 25 CP was an undisclosed principal has no bearing upon
whether this court has personal jurisdiction over Firstenberg.

would make the exercise of jurisdiction fair, just, or reasonable.'" Sawtelle, 70 F.3d at 1391 (quoting Rush v. Savchuk, 444 U.S. 320, 329 (1980)).  Its function is to ensure "that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state." Id. (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774).

Purposeful availment rests on two cornerstones: voluntariness and foreseeability.  See Sawtelle, 70 F.3d at 1391-93.  First, the defendant's contacts with the forum state must be voluntary.  See Nowak, 94 F.3d at 716.  This requirement is not satisfied when those contacts are "based on the unilateral actions of another party or a third person." Id.  Here, Firstenberg claims that its only contacts with 25 CP were based on 25 CP's unilateral act of sending Firstenberg a check for the deposit due on the Hull. (See Firstenberg's Mem. of Law in Supp. of Its Mot. to Dismiss, Doc. No. 13-2, at 7.)  This argument is a red herring.  Gonzales emailed Halvorsen, a representative of LSNE and 25 CP, on multiple occasions.  These contacts were not based on the unilateral actions of 25 CP.  Although it is unclear whether Gonzales or Halvorsen initiated the telephone calls between the two, Firstenberg does not claim that these

-21-

conversations were based on the unilateral actions of 25 CP.

In addition, "[e]ven if a defendant's contacts with the forum are deemed voluntary, the purposeful availment prong of the jurisdictional test investigates whether the defendant benefitted from those contacts in a way that made jurisdiction foreseeable." Phillips Exeter, 196 F.3d at 292 (citing Ticketmaster, 26 F.3d at 207).  An exercise of personal jurisdiction over a nonresident defendant is foreseeable, and therefore appropriate, "where the defendant purposefully derives economic benefits from its forum-state activities," Nowak, 94 F.3d at 717, or makes "a purposeful decision . . . to 'participate' in the local economy," Bond Leather, 764 F.2d at 933-34.  Similarly, the assertion of personal jurisdiction over a nonresident defendant is foreseeable when that defendant has reached out to establish a continuing relationship or obligation between itself and a resident of the forum state.  See Burger King, 471 U.S. at 473, 476; Sawtelle, 70 F.3d at 1393.  Here, Firstenberg, through Gonzales, reached out to a New Hampshire resident in order to derive economic benefit. Gonzales called and emailed Halvorsen, in New Hampshire, to solicit business.[9]  This solicitation led to negotiations and an

---

[9] The First Circuit has noted that it may be difficult to prove "purposeful availment" when the defendant has emailed the

alleged contract to sell the Hull for $190,000, no small sum. The invoice Gonzales sent Halvorsen to reflect their agreement included a New Hampshire address for LSNE, the listed buyer. Thus, even if Firstenberg thought that LSNE was purchasing the Hull, it should have foreseen that it would be subject to suit in New Hampshire if it breached the alleged contract.

### 3.   **Reasonableness**

I must consider the reasonableness of the exercise of jurisdiction over Firstenberg in light of certain gestalt factors.  Daynard, 290 F.3d at 62.

> These gestalt factors include:  [1] the defendant's
> burden of appearing; [2] the forum State's interest in
> adjudicating the dispute; [3] the plaintiff's interest
> in obtaining convenient and effective relief; [4] the
> interstate judicial system's interest in obtaining the
> most efficient resolution of the controversy; and [5]
> the shared interest of the several States in furthering
> fundamental substantive social policies.

Northern Laminate, 403 F.3d at 26 (citing Burger King, 471 U.S. at 477).  "The gestalt factors rarely seem to preclude jurisdiction where relevant minimum contacts exist," Cambridge

---

forum state because, unlike a letter, an email requires no physical address.  See Prairie Eye Ctr., 530 F.3d at 28 n.3.  The fact that Gonzales called Halvorsen in New Hampshire before emailing him, presumably at a number with a "603" area code, shows that Gonzales knew that he was emailing an individual in New Hampshire.  (See 25 CP's Objection to Firstenberg's Mot. to Dismiss Ex. A, Doc. No. 16-3, at 3.)

Literary Props., 295 F.3d at 66, and this case is no exception.

     As to the first factor, it is clearly more burdensome for Firstenberg to appear in New Hampshire than to appear in California.  However, this factor "is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker, 42 F.3d at 64.  Firstenberg has demonstrated no such burden.

     The second and third factors weigh in favor of exercising jurisdiction over Firstenberg.  "The purpose of the inquiry [regarding the second factor] is not to compare the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum has an interest." Foster-Miller, 46 F.3d at 151.  New Hampshire clearly has an interest in protecting its businesses from breaches of contract.  Analyzing the third factor requires according 25 CP's choice of forum a degree of deference.  Id.  25 CP's interest in obtaining convenient and effective relief is clearly better served by allowing the company to sue in New Hampshire, where it is located.[10]

_____

     [10] Firstenberg argues that the third factor weighs against exercising jurisdiction because 25 CP cannot "obtain convenient and effective relief" in New Hampshire because it cannot obtain effective relief anywhere.  (See Firstenberg's Mem. of Law in Supp. of Its Mot. to Dismiss, Doc. No. 13-2, at 7-9.) Firstenberg notes that 25 CP must be seeking to enforce either a

The fourth factor "usually . . . is a wash," Nowak, 94 F.3d at 718, and that is the case here.  The interstate judicial system's interest in promoting an efficient administration of justice will be equally well satisfied in California or New Hampshire, as parties and potential witnesses are located in both states.

The fifth factor "addresses the interests of the affected governments in substantive social policies." Nowak, 94 F.3d at 719.  New Hampshire has an interest in protecting its businesses from breaches of contract and in providing a convenient forum for addressing such breaches, but California has an interest in providing its businesses with a convenient forum for defending themselves against potentially false allegations.  Thus, this factor favors neither party.  See id. (considering both plaintiffs' government's interest in protecting its citizens and defendant's government's interest in protecting its

---

contract between itself and FMC or a contract between LSNE and FMC.  (See id. at 8.)  If the former, Firstenberg argues that 25 CP will be unsuccessful because Firstenberg lacks the necessary contacts with 25 CP in New Hampshire.  (See id.)  This argument is repetitive and unpersuasive.  If the latter, Firstenberg argues that 25 CP cannot obtain effective relief because Firstenberg does not own or possess the machine 25 CP wishes to buy.  (Id.)  This argument may be relevant to the merits of the case, but it has no bearing on the personal jurisdiction analysis.

businesses).[11]

Jurisdiction over Firstenberg in New Hampshire is certainly reasonable.  Accordingly, I conclude that subjecting Firstenberg to jurisdiction of the courts in New Hampshire would not violate the Due Process Clause of the Constitution.[12]

**B.    Personal Jurisdiction over Grifols**

Grifols argues that it was not involved in the contract between Firstenberg and either LSNE or 25 CP, and thus has no relevant contacts with New Hampshire.  25 CP counters that Grifols, the owner of the Hull, was a principal who used Firstenberg as an agent to sell its used equipment.  Thus, 25 CP argues, this court may impute Firstenberg's contacts to Grifols for the purposes of personal jurisdiction.

"Under basic principles of agency law, forum-related

---

[11] New Hampshire may have a stronger interest here because 25 CP is the alleged victim.  See Trade Wings, 2002 DNH 182, 15 ("[The plaintiff's] claimed injury implicates the public policy favoring the prevention of unfair or deceptive acts in business transactions.  New Hampshire has the strongest interest in this public policy because its citizen is the alleged victim of [such practices here].").  Regardless, it is still reasonable to exercise personal jurisdiction over Firstenberg.

[12] Firstenberg has requested an oral argument.  (See Firstenberg's Mot. to Dismiss, Doc. No. 13, at 2.)  I deny this request because the facts and law are sufficiently clear and oral argument would serve no useful purpose.

contacts made by an agent acting within the scope of an agency relationship are attributable to the principal." Dagesse v. Plant Hotel N.V., 113 F. Supp. 2d 211, 216 n.2 (D.N.H. 2000); see also Sawtelle, 70 F.3d at 1389 n.4; Daynard, 290 F.3d at 55. Consignees are generally considered agents. See Restatement (Third) of Agency § 6.02, cmt. d (2006) ("A consignment of goods creates an agency relationship between the consignor and the consignee. The consignee has power to sell the goods on behalf of the consignor, who retains title to them."); see also Rogers v. U.S. Rubber Co., 20 A.2d 626, 627 (N.H. 1941) ("The very term ["consignment"] imports an agency.") (internal quotation omitted). Although it is conceivable that the consignor-consignee relationship might be treated differently than the general principal-agent relationship for the purposes of personal jurisdiction, Grifols has cited no case law, and I have found none, to support that proposition.[13]

---

[13] I also note that "[t]he exact type of agency relationship used to impute contacts is not crucial to [my] inquiry regarding traditional notions of fair play and substantial justice." Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 7 (1st Cir. 2002). "'[T]he [relevant] question . . . is whether a sufficient relationship exists under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between the two defendants exists.'"). Id. at 8 (quoting Daynard, 290 F.3d at 56-57.)

25 CP, on the other hand, cites Camar Corp. v. N.R. Acquisition Corp., No. 96-40095-NMG, 1997 WL 118419 (D. Mass. Mar. 11, 1997), which, although not perfectly analogous, supports the proposition that Firstenberg's contacts may be imputed to Grifols.  In Camar, a party that admitted to being an agent, see id. at *4, dismantled an aircraft carrier for a principal and sold the aircraft's metal and equipment on behalf of the principal, who held title to the items from the carrier and was entitled to certain payments from sales, see id. at *1.  This relationship is similar to the relationship that 25 CP alleges existed between Grifols and Firstenberg because Firstenberg facilitated the sale of the Hull while Grifols (presumably) retained title to the Hull.  (See Mem. of Law in Supp. of Pl.'s Objection to Grifols' Mot. to Dismiss for Lack of Personal Jurisdiction, Doc. No. 17-2, at 7.)  In Camar, the court noted that "[t]he contacts of [the dismantler and seller of parts] are attributable to [the principal] because 'the contacts of a corporation's agent can subject the corporation to personal jurisdiction.'"  Id. at *4 n.1 (citing Pleasant St. I, 960 F.2d at 1090).  Camar thus suggests that the type of agency relationship that allegedly exists between Firstenberg and

Grifols is one in which it is appropriate for a court to impute contacts from the agent to the principal, as long as the agent is acting within the scope of its agency, which Firstenberg clearly would have been when advertising and contracting to sell the Hull.  Therefore, I assume that Firstenberg's contacts with Halvorsen may be imputed to Grifols, and thus that I may exercise personal jurisdiction over Grifols, if Firstenberg is Grifols' agent.

Even crediting all of 25 CP's non-conclusory allegations as true, which I must under the prima facie standard, 25 CP has not proffered sufficient evidence regarding Grifols' status as a principal to support personal jurisdiction.  25 CP's evidence does, however, suggest that, if provided time for jurisdictional discovery, it could proffer sufficient evidence that Grifols and Firstenberg are in a principal-agent relationship.  25 CP has provided evidence that Firstenberg is in the business of "sell[ing] . . . surplus equipment on consignment."  (See Pl.'s Objection to Grifols' Mot. to Dismiss for Lack of Personal Jurisdiction Ex. F., Doc. No. 17-8.)  When Gonzales emailed a shipping company about Halvorsen's order, his email noted that he "still [had] not received a confirmation as to when Grifols

-29-

[would] have the utilities disconnected from the machine." (See
Pl.'s Objection to Grifols' Mot. to Dismiss for Lack of Personal
Jurisdiction Ex. E., Doc. No. 17-8, at 2 (emphasis added).)
Because Grifols is "a biomedical research and development
institute" (Compl., Doc. No. 1-2, ¶ 8), and not in the utilities
or moving business, this email suggests both that Grifols was the
owner of the Hull, and that it had a principal-agent relationship
with Firstenberg.

In a case like this one, where the plaintiff has "[made] out
a colorable case for the existence of in personam jurisdiction,"
Negrón-Torres v. Verizon Commc'ns, Inc., 478 F.3d 19, 27 (1st
Cir. 2007), the facts supporting the existence of personal
jurisdiction are in the hands of the defendant, and the defendant
does not deny the relevant jurisdictional facts, jurisdictional
discovery is appropriate.[14] Thus, I will allow 25 CP sixty days

---

[14] Though 25 CP has not requested jurisdictional discovery,
I assume that it would prefer for me to consider providing time
for jurisdictional discovery rather than dismissing its claims
against Grifols outright. I have the authority to order
jurisdictional discovery sua sponte. See Hatfill v. Foster, 415
F. Supp. 2d 353, 356 (S.D.N.Y. 2006) (noting that the court had
previously sua sponte ordered fifteen days of jurisdictional
discovery where "it seemed that misrepresentations might have
been made to [the] court"); Am. Color Graphics v. Brooks Pharm.,
Inc., No. 8:05-CV-1512-T-27TBM, 2007 WL 3202748, *4 (M.D. Fla.
Oct. 29, 2007) (noting that "[t]his Court is not obliged to sua

for jurisdictional discovery to adduce evidence that a principal-agent relationship existed between Grifols and Firstenberg.[15]

Grifols makes two other unpersuasive arguments.  First, Grifols mischaracterizes 25 CP's argument by implying that 25 CP is asking this court to "subscribe to" an improper "transitive view of minimum contacts, which would hold that a letter from A to B that reports on C's actions confers personal jurisdiction over C in B's home state."  (See Mem. of Law in Supp. of Grifols' Mot. to Dismiss for Lack of Personal Jurisdiction, Doc. No. 14-2, at 9 n.7 (quoting Mass. Sch. of Law, 142 F.3d at 35).)  25 CP, however, is not suggesting that this court should exercise jurisdiction over Grifols because Firstenberg wrote a letter to 25 CP regarding Grifols' activities.  Rather, 25 CP correctly argues that this court may exercise jurisdiction over Grifols because Firstenberg contacted 25 CP in New Hampshire on Grifols' behalf, as Grifols' agent.

In addition, Grifols misconstrues Daynard v. Ness, a First

---

sponte order discovery," and thus implying that it may do so).

[15] Following jurisdictional discovery, Grifols may file a motion to reinstate its motion to dismiss.  If Grifols files such a motion, this court will establish a schedule for further status conferences and briefing.

Circuit case discussing imputation of contacts for the purposes of personal of jurisdiction.  There, the court explained that "[w]hether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct."  290 F.3d at 55. Grifols argues that because there is no evidence that Grifols ratified Firstenberg's actions, Firstenberg's contacts may not be imputed to Grifols.  This interpretation misreads Daynard, which requires either proof of initial authority to act or later ratification.  Here, I need not consider ratification, because Firstenberg, if it was a consignee for Grifols, had the authority to communicate with customers on behalf of Grifols.

## IV.  CONCLUSION

    For all of the foregoing reasons, I deny Firstenberg's motion to dismiss (Doc. No. 13).  Grifols' motion to dismiss (Doc. No. 14) is denied without prejudice to its right to seek reinstatement after the plaintiff has had an opportunity to conduct jurisdictional discovery.  The court grants the plaintiffs sixty days to conduct limited discovery, restricted to

specific facts that bear on the issues of agency and personal

jurisdiction.

    SO ORDERED.


                                   /s/Paul Barbadoro
                                   Paul Barbadoro
                                   United States District Judge

December 8, 2009

cc:  Michael R. Callahan, Esq.
     Thomas H. Good, Esq.
     Gordon J. MacDonald, Esq.
     Erik Graham Moskowitz, Esq.
     William B. Pribis, Esq.
     David G. Thomas, Esq.

-33-